## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:20-CV-376-MR-WCM

SHERRI WILKES,                    )
                                  )
        Plaintiff,                )
                                  )        **MEMORANDUM AND**
v.                                )        **RECOMMENDATION**
                                  )
BUNCOMBE OPERATIONS, LLC          )
D/B/A HARMONY AT REYNOLDS         )
MOUNTAIN,                         )
                                  )
        Defendant.                )
_____   )

This matter is before the Court on Defendant's Motion to Dismiss (Doc. 12), which has been referred to the undersigned pursuant to 28 U.S.C. §636 for the entry of a recommendation.

## I.    Procedural Background

On December 11, 2020, Plaintiff Sherri Wilkes ("Plaintiff") filed her original complaint asserting claims based on alleged racial discrimination and a hostile work environment. Doc. 1.

Plaintiff later filed amended complaints, <u>see</u> Docs. 4 & 8, and on May 24, 2021, Plaintiff filed a Corrected Second Amended Complaint (the "Complaint," Doc. 9), which is the operative pleading in this matter.

On June 7, 2021, Defendant Buncombe Operations, LLC d/b/a Harmony at Reynolds Mountain ("Defendant") filed the instant Motion to Dismiss and a

1

supporting memorandum. Doc. 12. Plaintiff has responded and Defendant has replied. Docs. 13, 14.

## II. Plaintiff's Allegations

Plaintiff alleges that Defendant does business in Buncombe County, North Carolina as "Harmony at Reynolds Mountain" ("Harmony") and that she is a former employee of Harmony. Doc. 9 at ¶¶ 4, 5.

In May of 2018, Plaintiff began working as a Director of Nursing at the "Harmony at Reynolds Mountain Senior Living facility." Id. at ¶ 6.

Plaintiff was the only African American manager at "The Crossings at Reynolds Mountain," Nancy Rathbone ("Rathbone"), a white female, was the "Concierge and Acting Executive Director," and Ann Watts ("Watts"), also a white female, was the Executive Director of Harmony. Id. at ¶¶ 8, 9, 10.[1]

Rathbone was Plaintiff's direct supervisor for at least part of Plaintiff's employment. Id. at ¶ 7.[2] Plaintiff alleges when she and Rathbone "had a disagreement or discussion about matters, Rathbone would tell Plaintiff that

---

[1] Plaintiff does not describe specifically how "The Crossings" is related to the "senior living facility" or Harmony.

[2] Plaintiff alleges that "[t]hroughout her employment, [her] direct supervisors, Nancy Rathbone and Ann Watts, both white females, subjected her to racial discrimination by making threatening remarks and holding her to different terms and conditions than her white coworkers." Id. at ¶ 7. It is unclear whether Plaintiff means that Rathbone was Plaintiff's supervisor only until Watts became Plaintiff's supervisor, or that Rathbone remained Plaintiff's supervisor even after Watts became Plaintiff's supervisor.

2

she had a permit to carry a concealed weapon. Rathbone threatened Plaintiff on multiple occasions. Plaintiff told Rathbone that she would press charges if she threatened her again." Id. at ¶ 11. Plaintiff alleges, upon information and belief, that Rathbone never made similar remarks or threats to white employees, even those who disagreed with her or engaged in misconduct. Id. at ¶ 12.

Watts became Plaintiff's supervisor in November 2018. Id. at ¶¶ 10, 13. At their first meeting, Watts accused Plaintiff of "being upset and defensive about the lack of support from Rathbone and about Rathbone's behavior." Id. at ¶ 14. Watts then "targeted Plaintiff because of her race by telling white employees that Plaintiff was the problem and needed to be gone." Watts, however, did not share personnel information about other employees in the same manner. Id. at ¶ 15.

On a separate occasion, Watts advised Plaintiff that she could not have both Thanksgiving and Christmas Day off, though to Plaintiff's knowledge, vacation or holiday time for white employees was not similarly limited. Id. at ¶ 16.

At another time, Plaintiff "was told that she could not eat lunch with her white co-worker…because it 'didn't look right,'" which required Plaintiff and her coworker to "hide just so they could each lunch together without Watts making negative comments." Id. at ¶ 17.

3

On yet another occasion, a different white female administrator falsely accused Plaintiff and another African American employee "of stealing and breaking into offices." However, no false accusations were made against white employees and no action was taken against the administrator for making the false allegations. Id. at ¶ 18. The same white administrator also refused to take action when Plaintiff found maggots in her office, notwithstanding that the administrator responded to requests from white managers. Id. at ¶ 19.

Plaintiff alleges that "Watts continuously tried to find reasons to issue disciplinary actions to Plaintiff" and that Watts "wrote Plaintiff up" for coming to work wearing a sweatshirt and winter hat when it was cold outside even though Watts herself would wear a "hoodie with a blazer over it all day." White employees were not similarly chastised or "written up." Id. at ¶¶ 20, 21.

Plaintiff also alleges, upon information and belief, that "Watts engaged in a pattern of giving black employees 'final write-ups' without the employees having any prior infractions." Id. at ¶ 22. Relatedly, Plaintiff alleges that she received a warning for failing to submit a report, which Watts claimed "affected financials," in a timely manner, though a white manager was not reprimanded when he forgot to submit a report that also impacted "financials." Id. at ¶ 23.

In December 2018, Plaintiff complained of Watts' discriminatory treatment to Human Resources Analyst Rhonda Halsey ("Halsey"). Id. at ¶ 25. Halsey advised Plaintiff that she would investigate and get back to Plaintiff,

"but the discriminatory treatment continued" and Plaintiff is unsure if Halsey actually undertook any action. Id. at ¶¶ 26, 27

In February 2019, Plaintiff again complained to Halsey, but the discriminatory behavior by Watts continued. Id. at ¶ 28. Plaintiff also complained about Watts' behavior to Tammy Sutton ("Sutton"), a Clinical Regional Nurse who was "above Plaintiff's rank," but Watts' behavior did not change. Id. at ¶ 29.

Soon thereafter, Plaintiff wrote a letter to Halsey, describing the "continued discrimination and harassment from Watts." Id. at ¶ 30.

On March 27, 2019, Plaintiff filed an internal written complaint with Defendant. Id. at ¶ 31.

In April of 2019, Defendant began an investigation into Watts' behavior and Defendant's Chief Compliance Officer came to the facility and "told the employees that they needed to treat each other the same and treat each other with respect." Id. at ¶ 32.

The same month, Halsey and regional Executive Director Heather Hess also came to the facility to investigate "allegations made by staff against Watts." Id. at ¶ 33.

Watts was asked to resign in August of 2019 due to Plaintiff's complaints and the complaints of other employees. Doc. 12-2 at 2. After refusing to resign, Watts was placed on "Final Warning" on or around August 14, 2019. Id.

5

On August 28, 2019, Plaintiff was "written up for insubordination." <u>Id</u>. at ¶ 34.

On September 9, 2019, "Plaintiff filed a complaint for retaliation to HR." <u>Id</u>. at ¶ 35.

On September 12, 2019, Watts "again falsely accused Plaintiff of misconduct." <u>Id</u>. at ¶ 37.

The next day, September 13, 2019, "Plaintiff was written up after a misunderstanding with a patient" and was accused by a police officer of being unprofessional and cursing at staff members. Plaintiff alleges that Watts knew Plaintiff did not curse at staff members "but wrote her up anyway for doing so." <u>Id</u>. at ¶ 38. When Plaintiff spoke to Halsey about the matter, Halsey responded that Plaintiff should "beat" Watts "at her own game." <u>Id</u>. at ¶ 39.

On September 19, 2019, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Doc. 12-2 at 2-3.[3]

---

[3] Defendant has submitted a copy of Plaintiff's EEOC Charge of Discrimination (the "EEOC Charge"), as well as a copy of a Right to Sue Letter that Plaintiff later received. <u>See</u> Docs. 12-2, 12-3. These materials may be considered in connection with the Motion to Dismiss. <u>See e.g.</u>, <u>Philips v. Pitt Cty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009); <u>Herbert v. Horizon Coach Lines</u>, No. 3:15-CV-6-GCM, 2015 WL 3649091, at *1 n.1 (W.D.N.C. June 11, 2015) ("The Court may consider an EEOC charge without converting a motion to dismiss into one for summary judgment.").

Subsequently, Plaintiff asked Halsey if Plaintiff would be terminated and Halsey did not respond. Doc. 9 at ¶ 36.

Watts' employment was ultimately terminated on October 2, 2019. Id. at ¶ 43. Later, HR asked Plaintiff if she was "satisfied with Watts' termination" to which Plaintiff responded that she only wanted to be treated fairly. Id. at ¶ 44.

"After continued mistreatment Plaintiff gave a two-week notice on or about October 8, 2019 and stayed until November 13, 2019." Id. at ¶ 45.

On September 12, 2020, Plaintiff received a Right to Sue Letter from the EEOC. Id. at ¶ 54.

## III. Legal Standard

When considering a motion made pursuant to Rule 12(b)(6), the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009); Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible

7

on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>see</u> <u>Consumeraffairs.com</u>, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>accord</u> <u>Consumeraffairs.com</u>, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. <u>Twombly</u>, 550 U.S. at 570; <u>Consumeraffairs.com</u>, 591 F.3d at 256.

## IV.    Discussion

In her Complaint, Plaintiff states that she is seeking legal and equitable relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq* ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981") based on alleged racial discrimination and a hostile work environment.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…." 42 U.S.C. § 2000e-2(a)(1); <u>see also</u> <u>E.E.O.C. v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 313 (4th Cir. 2008) ("Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action") (internal

quotation marks and citation omitted). Section 1981 provides that "[a]ll persons…shall have the same right…to the full and equal benefit of all laws and proceedings…as is enjoyed by white citizens…." 42 U.S.C. §1981(a).

As the elements for claims under Title VII and Section 1981 are the same, Plaintiff's claims under both statutes are discussed together below, except where indicated. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 n. 7 (4th Cir. 2002) (citing Gairola v. Va. Dept. of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir.1985)) ("The required elements of a prima facie case of employment discrimination are the same under Title VII and Section 1981"); Woods v. Mann+Hummel Filtration Tech. U.S. LLC, No. 3:17-CV-00605-KDB-DCK, 2019 WL 3728687, at *7 (W.D.N.C. Aug. 7, 2019); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001) (considering plaintiff's claims of a racially hostile work environment and noting that the "elements are the same under either § 1981 or Title VII") (citations omitted).

## A. Race Discrimination Claims

Absent direct evidence of discriminatory treatment, "a plaintiff must eventually put forth a prima facie case of discrimination by establishing that (1) he is a member of a protected class; (2) he suffered an adverse action; (3) his job performance was satisfactory; and (4) the adverse action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" Tutt v. Wormuth, No. 19-2480, 2021 WL 4076729, at *1 (4th Cir. Sep. 8, 2021)

(per curiam) (quoting <u>Adams v. Trs. of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011)).

However, in a Title VII case, the plaintiff "'need not plead a prima facie case of discrimination' to survive a motion to dismiss.'" <u>Bing v. Brivo Sys., LLC</u>, 959 F.3d 605, 616 (4th Cir. 2020) (quoting <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506. 515 (2002)). "Instead, a Title VII plaintiff is 'required to allege facts to satisfy the elements of a cause of action created by that statute.'" <u>Id</u>. (quoting <u>McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.</u>, 780 F.3d 582, 585 (4th Cir. 2015)). That is, complaints in employment discrimination cases "must satisfy only the simple requirements of Rule 8(a)." <u>Miller v. Carolinas Healthcare Sys.</u>, 561 Fed. Appx. 239, 241 (4th Cir. Mar. 13, 2014).

In determining whether such a showing has been made, courts consider "whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" <u>Bing</u>, 959 F.3d at 617 (quoting <u>Coleman v. Md. Ct. of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010)); <u>see also</u> <u>Martinez v. Constellis, LLC</u>, No. 3:19CV720, 2020 WL 4589194, at *3 (E.D. Va. Aug. 10, 2020).

In this case, Defendant argues that Plaintiff has not suffered any adverse employment action or alleged facts that give rise to an inference of

discrimination. <u>See</u> Doc. 12-1 at 8, 9.[4]

### 1. Adverse Employment Action

"An adverse employment action is an action 'that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" <u>Jensen-Graf v. Chesapeake Employers' Ins. Co.</u>, 616 Fed. Appx. 596, 598 (4th Cir. 2015) (quoting <u>Hoyle v. Freightliner, LLC</u>, 650 F.3d 321, 337 (4th Cir. 2011)) (quotation omitted)).

A constructive discharge may constitute an adverse employment action. <u>Lacasse v. Didlake, Inc.</u>, 712 Fed. Appx. 231, 239 (4th Cir. 2018) (citing <u>Holsey v. Armour & Co.</u>, 743 F.2d 199, 209 (4th Cir. 1984)) ("A constructive discharge—an allegation that the employer made the employee's working conditions so intolerable that she was forced to quit her job—may constitute an adverse employment action").

Here, Plaintiff has not alleged that her compensation, hours, responsibilities, opportunities, or job title changed as the result of Defendant's conduct; that is, the only possible "adverse employment action" pointed to by Plaintiff is a constructive discharge.

---

[4] Defendant does not contend that Plaintiff is not a member of a protected class or that her job performance was unsatisfactory.

Defendant argues that to the extent Plaintiff's racial discrimination claim is based on a constructive discharge, Plaintiff did not exhaust her administrative remedies. Further, Defendant asserts that even if she has exhausted her administrative remedies, she has not alleged sufficient facts to establish constructive discharge. Doc. 12 at 1.

### a. Exhaustion of Administrative Remedies[5]

Before proceeding in federal court, a Title VII plaintiff must first exhaust her administrative remedies by filing a charge with the EEOC and obtaining a right-to-sue letter. Sloop v. Memorial Mission Hosp., Inc., 198 F.3d 147, 148 (4th Cir. 1999). As a general matter, the scope of a plaintiff's suit is determined by the contents of her EEOC charge. Atkinson v. Vidant Med. Ctr., No. 4:18-CV-161-BO, 2019 WL 5700732, at *3 (E.D.N.C. Nov. 4, 2019) (citing Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002)).

However, the Fourth Circuit has "long held that courts may in fact adjudicate claims not raised before the agency, if certain requirements are met." Stewart v. Iancu, 912 F.3d 693, 705 (4th Cir. 2019). In particular, the "scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such

---

[5] Defendant's exhaustion argument is made only with respect to Plaintiff's Title VII racial discrimination claim. Defendant acknowledges that exhaustion is not required for Plaintiff's Section 1981 claim. Doc. 12-1 at 6 n. 3.

allegations during the pendency of the case before the agency." Id. at 705 (quoting Hill v. Western Elec. Co., 672 F.2d 381, 390 n.6 (4th Cir. 1982) (internal quotations omitted)). "Only 'those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" Id. (quoting Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005) (citation omitted)); see also Sydnor v. Fairfax Cnty, 681 F.3d 591, 595 (4th Cir. 2012).

In this case, Plaintiff's EEOC Charge was filed on September 19, 2019 and stated:

> I am currently employed by [Harmony] as Director of Nursing HCC. Since filing a complaint of discrimination against my manager, Executive Director (ED), on March 27, 2019, I have been subjected to continued harassment and disciplined for actions my (White) counterparts are not. On September 9, 2019 I made a complaint of retaliation to Human Resources (HR). On September 12, 2019, I was accused of misconduct by my manager.

> As a result of the investigation into my complaints, and complaints of other employees, my manager was asked to resign in August 2019. She refused and was placed on Final Warning, on or around August 14, 2019. Nothing has changed. I continue to be targeted and subjected to a hostile work environment. HR and other management are aware [of] her inappropriate behavior, dereliction of duties, and retaliatory actions but continue to let it happen. I believe the accusation of misconduct to be pretextual and a retaliatory attempt to lead to my eventual discharge.

Doc. 12-2 at 2-3.

Defendant argues that constructive discharge must be specifically stated in an EEOC filing before a plaintiff can be said to have exhausted her administrative remedies and that Plaintiff's EEOC Charge did not include allegations of constructive discharge. In response, Plaintiff contends that her EEOC Charge alleged facts "which involve continuous discriminatory acts creating a hostile work environment." Doc. 13 at 10.

The EEOC Charge described conduct Plaintiff was experiencing at the time, and it suggested that Plaintiff believed her manager's false accusation of misconduct was designed to support Plaintiff's eventual termination. When Plaintiff filed her EEOC Charge in mid-September 2019, however, she was still employed by Defendant and, according to her Complaint, Plaintiff continued to work after filing the EEOC Charge, giving notice on or about October 8, 2019 and voluntarily leaving her employment with Defendant on November 13, 2019. Doc. 9, ¶ 45. Plaintiff did not file another charge with the EEOC after her resignation to allege constructive discharge specifically.

In sum, as the EEOC Charge was filed when Plaintiff was employed— and some three weeks before she gave notice of her resignation and nearly two months before her actual voluntary resignation—it is not clear that the EEOC had the opportunity to consider whether the circumstances of Plaintiff's work environment were so intolerable that they led to her constructive discharge.

Because this discrete discriminatory act was not alleged in her EEOC Charge, Plaintiff did not exhaust her administrative remedies on this claim. See Ortiz v. Big Bear Events, LLC, No. 3:12–cv–341–RJC–DCK, 2013 WL 247444, at *3 (W.D.N.C. Jan. 23, 2013) ("A claim for constructive discharge is a separate act requiring administrative exhaustion") (citing Young v. Nat'l Ctr. for Health Serv. Rsch., 828 F.2d 235, 237–38 (4th Cir.1987)); Tom v. Montgomery Cty. Pub. Sch., No. CV 20-3386 PJM, 2021 WL 1720851, at *2 (D. Md. Apr. 30, 2021) (finding plaintiff failed to exhaust administrative remedies as to her constructive discharge claim where constructive discharge was not raised in plaintiff's EEOC charge and plaintiff retired about three months after filing the charge); Sullivan v. Perdue Farms, Inc., 133 F. Supp. 3d 828, 835 (E.D. Va. 2015).

### b. Sufficiency of Plaintiff's Allegations

Because exhaustion of administrative remedies is not required for a Section 1981 claim, the undersigned has also considered Defendant's argument regarding the sufficiency of Plaintiff's allegations of constructive discharge.[6]

"To prove a constructive discharge, the plaintiff must show: (1) that the employer's actions were deliberate, and (2) that working conditions were

---

[6] Should the District Court determine that Plaintiff has exhausted her remedies as to her Title VII racial discrimination claim, this analysis would also apply to that claim.

intolerable." <u>Lacasse v. Didlake, Inc.</u>, 712 Fed. Appx 231, 239 (4th Cir. 2018) (citing <u>Heiko v. Colombo Sav. Bank, F.S.B.</u>, 434 F.3d 249, 262 (4th Cir. 2006)). A plaintiff must show that she was discriminated against by her employer to the point where a reasonable person would have felt compelled to resign, and that she did, in fact, resign. <u>Evans v. Int'l Paper Co.</u>, 936 F.3d 183, 193 (4th Cir. 2019). The conditions must go "beyond 'ordinary' discrimination" and be "intolerable." <u>Lloyd v. Riveredge Operating Co.</u>, GLR-20-3162, 2021 WL 2550495, at *4 (D. Md. June 21, 2021) (citing <u>Evans</u>, 936 F.3d at 193)); <u>see also</u> <u>Heiko v. Colombo Sav. Bank, F.S.B.</u>, 434 F.3d 249, 262 (4th Cir. 2006) ("mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign") (quoting <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 378 (4th Cir. 2004)).

Courts use an objective standard to determine whether the relevant working conditions were intolerable. <u>Lacasse</u>, 712 Fed. Appx. at 239. The frequency of the conditions is relevant, and courts consider "the totality of the circumstances" when determining whether a resignation was, in fact, a constructive discharge. <u>Lloyd</u>, 2021 WL 2550495, at *4 (citing <u>Evans</u>, 936 F.3d at 193; <u>Bodkin v. Town of Strasburg</u>, 386 Fed. Appx. 411, 413 (4th Cir. 2010)).

Here, while Plaintiff's Complaint describes events up to the filing of her EEOC Charge, her pleading provides few details about events that transpired

thereafter. Plaintiff's EEOC Charge states that Watts was asked to resign in August and, upon refusing, was placed on "Final Warning" on approximately August 14, 2019. Plaintiff alleges that Watts was terminated on October 2, 2019 and that Plaintiff gave her own notice on October 8, 2019 "after continued mistreatment." However, she does not provide any details about this "continued mistreatment," including its frequency or severity, to indicate that the conditions of her employment—even after Watts' employment had ended— were so intolerable that she had no choice but to leave.[7]  Further, Plaintiff did not actually leave her job until November 13, 2019.

Consequently, the undersigned is not persuaded that Plaintiff has sufficiently alleged constructive discharge in order to satisfy the adverse employment action element of her racial discrimination claim.

### 2.    Inference of Discrimination

The inference of discrimination element "can be met by showing that 'similarly-situated employees outside the protected class received more favorable treatment.'" Tutt v. Wormuth, No. 19-2480, 2021 WL 4076729, at *1 (4th Cir. Sep. 8, 2021) (per curiam) (quoting White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)).

---

[7] Nor does Plaintiff's Complaint state specifically that she was constructively discharged.

Here, Plaintiff does not allege that any racial slurs were used or that Rathbone or Watts specifically referenced Plaintiff's race during their alleged mistreatment of Plaintiff. However, Plaintiff has alleged numerous instances of misconduct and consistently alleges that her white co-workers were not subjected to the same treatment.

Bearing in mind that "discrimination claims are particularly vulnerable to premature dismissal because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior," Woods v. City of Greensboro, 855 F.3d 639, 652 (4th Cir. 2017), and taking the facts as alleged in the Complaint in the light most favorable to Plaintiff, the undersigned is persuaded that Plaintiff has alleged sufficient facts to give rise to an inference of discrimination to survive a motion to dismiss.

However, as discussed above, the undersigned will recommend that Plaintiff's racial discrimination claims under Title VII and Section 1981 be dismissed.

### B. Hostile Work Environment Claims

"A racially hostile working environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ki v. Svnicki, No. GJH-20-130, 2021 WL 3857855, at *5 (D. Md. Aug. 30, 2021) (quoting Boyer-

Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015)) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

The elements of a claim for a hostile work environment are (1) unwelcome harassment, (2) based on race, (3) that was severe or pervasive enough to alter the plaintiff's employment or create an abusive environment, and (4) that liability can be imputed to the employer. Perkins v. Int'l Paper Co., 936 F.3d 196, 207-08 (4th Cir. 2019); Spriggs, 242 F.3d at 183-84 ("The elements are the same under either § 1981 or Title VII").

Here, Defendant argues that Plaintiff's claim does not satisfy the second, third, and fourth elements.

### 1. Based on Race

"In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions." Strothers v. City of Laurel, 895 F.3d 317, 329 (4th Cir. 2018) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998)).

As discussed above, while Plaintiff does not allege that Rathbone or Watts specifically referenced Plaintiff's race, Plaintiff has provided numerous descriptions of conduct and harassment that were directed at her and other African American employees but not at her white co-workers.

19

While Defendant may challenge those allegations, considering them in the light most favorable to Plaintiff, the undersigned is persuaded that Plaintiff has alleged sufficient facts to indicate she was being mistreated because of her race.

### 2. Severe or Pervasive Behavior

To satisfy this element, a plaintiff must demonstrate both that she subjectively perceived the harassment as being hostile, and that the harassment would be viewed similarly by a reasonable person. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). In considering this requirement, courts review the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Strothers, 895 F.3d at 331 (quoting Harris, 510 U.S. at 23); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). A pattern of relentless abuse is not required; this element can be met by "a single extremely serious act of harassment or by a series of less severe acts." Robinson v. Perales, 894 F.3d 818, 828 (7th Cir. 2018), reh'g denied (July 24, 2018) (citing Haugerud v. Amery Sch. Dist., 259 F.3d 678, 693 (7th Cir. 2001) (recognizing "that harassment need not be both severe and pervasive")); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 280

(4th Cir. 2015) (en banc) (concluding that a reasonable jury could find that two uses of a racial epithet were enough to engender a hostile work environment).

Here, Defendant argues that none of the conduct of which Plaintiff complains was frequent, physically threatening, or humiliating, and that none of the conduct interfered with Plaintiff's ability to do her job. Doc. 12-1 at 15.

The precise chronology of the events as alleged in the Complaint is not entirely clear. Similarly, Plaintiff's Complaint could be more explicit in describing the frequency of the alleged conduct by Rathbone and Watts.

Nonetheless, Plaintiff alleges numerous incidents that took place over the course of many months from 2018 through 2019, including Watts' discussion with white employees of Plaintiff being "the problem," refusal to allow Plaintiff to have both Thanksgiving and Christmas Day off, and pattern of giving black employees "'final write-ups' without the employees having any prior infractions." Additionally, Plaintiff alleges that Rathbone "threatened Plaintiff on multiple occasions" and advised Plaintiff that she (Rathbone) had a permit to carry a concealed weapon. Finally, Plaintiff alleges that another white female administrator falsely accused Plaintiff and another African American employee of stealing, and that Plaintiff and a white coworker were told they could not each lunch together because it "didn't look right."

The undersigned finds these allegations, taken in the light most favorable to Plaintiff, sufficient at the motion to dismiss stage for purposes of the third element.

### 3. Imputing Liability to Defendant

When determining whether liability may be imputed to a defendant employer, the "status of the harasser" is relevant. Boyer-Liberto, 786 F.3d at 278. "On the one hand, '[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.'" Id. (quoting Vance v. Ball State Univ., 570 U.S. 421, 424, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013)). "On the other hand, where the harasser is the victim's supervisor, different rules apply: The employer is strictly liable for the supervisor's harassing behavior if it culminates in a tangible employment action, but otherwise may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Id. (internal quotations omitted).

Defendant argues that it took immediate action upon receiving Plaintiff's written complaint on March 27, 2019 and that by investigating the complaint and subsequently dismissing Watts, Defendant exercised reasonable care and cannot be liable for Watts' harassment. Defendant asserts that it can only be

found liable for harassment after Plaintiff filed her written complaint, and that the two employee write-ups occurring after that date are insufficient on their own to constitute actionable harassment.

However, Plaintiff has alleged that she complained about Watts' discriminatory treatment to Halsey (an HR Analyst) in December of 2018 and again in February of 2019, and that despite such complaints, the discriminatory treatment continued. Plaintiff also alleges that she complained to Sutton, "who was above Plaintiff's rank," and sent a letter (presumably in February or March of 2019) to Halsey "detailing the continued discrimination and harassment" prior to submitting an internal complaint on March 27, 2019. In short, Plaintiff alleges that she reported the alleged misconduct and harassment on at least four separate occasions prior to submitting an internal complaint.

Further, while the facts as alleged by Plaintiff indicate that Plaintiff filed an internal written complaint with Defendant in late March 2019 and that Defendant began an investigation into Watts' behavior the following month, Watts was not asked to resign until August 2019, and thereafter was placed on "Final Warning" when she refused to resign. Watts' employment was not terminated until early October 2019.

Consequently, Plaintiff has made a sufficient showing at this stage of the case as to the fourth element.

## V. Recommendation

The undersigned respectfully **RECOMMENDS** that Defendant's Motion to Dismiss (Doc. 12), be **GRANTED IN PART AND DENIED IN PART** as follows:

(1) That Plaintiff's racial discrimination claim under Title VII be **DISMISSED WITHOUT PREJUDICE** as Plaintiff failed to exhaust administrative remedies, or in the alternative, that this claim be **DISMISSED.**

(2) That Plaintiff's racial discrimination claim under Section 1981 be **DISMISSED**.

(3) That Plaintiff's hostile work environment claims be allowed to proceed.

Signed: November 4, 2021

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See <u>Thomas v. Arn</u>, 474 U.S. 140, 140 (1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).